Give your attention, and you will be heard. God save these United States and this armored court. Good morning. Welcome to the Ninth Circuit. Thank you for coming together. We have three consolidated appeals. We'll hear first, consolidated for purposes of appeal. We haven't consolidated the cases themselves, but I think I appreciate all counsel in helping us get a schedule that will help us hear these and decide these cases as expeditiously as possible. So we'll go ahead and hear argument in the first case, well, the first set of cases, North American Derivatives Exchange, Inc. v. Kalsche, case number 25-7187, also v. Robin Hood Derivatives, LLC, case number 25-7516, and, excuse me, v. State of Nevada is what these all are. We have Kalsche, Robin Hood in the case, or North American Derivatives, Kalsche, and Robin Hood, and I guess we'll hear argument in that order. We have, I know, State of Nevada, you felt a little short-changed by 30 minutes. I suspect that we'll be able to accommodate everybody with not everything they want to say, but within reason, we'll keep it, but knowing how complicated and how many issues are in this case, we would ask that the parties try and stick to the time limits. The appellants, if you can let us know if you want to reserve time, you know, I'm not going to tell you, not all of you can. My preference would be that one of you reserve time for rebuttal, not all three, but look, it's your time, we're going to give you 13 minutes, you use it wisely. And so we'll give each of you 13 minutes, and then Commodities Future Trading Commission will give you six minutes. The anticipation would be you would not be reserving time as amicus, and then State of Nevada will give you 30 minutes or whatever. The theory was most of these issues are going to dovetail, so I think you'll have enough time, but if you don't, we'll make it work. All right, so with that, we'll go ahead with, I think, Mr. Dvoretsky, if I have it correctly. Good morning, your honors. May it please the court, Shai Dvoretsky for CDNA. I'd like to try to reserve four minutes for rebuttal, if I could. The CEA preempts Nevada law as applied to CDNA's sports event contract by expressly giving the CFTC exclusive jurisdiction over on DCM swap trading. To protect our financial system, the Dodd-Frank Act defines swaps broadly to include contracts where payment turns on the occurrence, non-occurrence, or the extent of the occurrence of an event. It's associated with a potential financial, economic, or commercial consequence. As the certain... So I wanted to ask about that, because obviously, this case turns on a lot of things, but one of the things it turns on is the definition of swap, which you just read, and you have a pretty strong argument that read in its plain text, it could be read broadly. The district court read it differently, and it read it a little more narrowly. So I'd like you to address why, in your view, the best and only reading has to be the broad reading that, you know, basically what you just read, as opposed to the gloss that the district court gave on it. So the gloss that the district court gave on it was the district court concluded that an event and an occurrence... I'm sorry, an event and an outcome from the event have to be two fundamentally different things. And as a matter of ordinary language, that's just not true. The ordinary meaning of an event is very broad. It can include the outcome of a competition. An event is just something that happens. And so even outside the sports context, you could say that the Federal Reserve meeting next week is an event. You could also say that the Federal Reserve lowering or raising interest rates is an event. Either way, it's an event. And so the district court's reading of the term just isn't consistent with the statutory text. A broad understanding of swap is also consistent with what Congress was trying to accomplish in Dodd-Frank, right? Dodd-Frank was a statute passed in the wake of the financial crisis. Congress was trying to give the CFTC broad jurisdiction in order to protect the financial system, where you have transactions involving financial institutions. And so Congress enacted a very broad definition of swap for that purpose. This is all consistent with what the Third Circuit held just last week when it concluded that sports event contracts plainly fall within the definition of a swap. And because they are swaps, they are subject to the exclusive jurisdiction of the CFTC. Exclusive jurisdiction also has only one meaning. Exclusive necessarily means if the CFTC has exclusive jurisdiction, that forecloses other entities like states from asserting jurisdiction over the same thing. So let's talk about some practical realities here because it may or may not matter. I mean, you know, Congress does things all the time that might be unintended consequences. But is there any suggestion in Dodd-Frank in 2010 when it was amended, which is the relevant time period we're talking about here, that they intended to transfer jurisdiction over sports gaming or gaming generally away from the states to the CFTC? So, Judge Nelson, I don't think that's what Congress did. And that's not what we're arguing that Congress did. Our argument is that Congress gave the CFTC exclusive jurisdiction over swaps. And if gaming is included in the definition of swaps, then the natural import of that is that all gaming was encompassed within the definition of swap and therefore transferred to the CFTC. So a couple of points. One, there is a distinction between sports bets, which is what happens at Caesars in Las Vegas or what could happen on a sports book, and a sports event contract. A sports event contract is just a species of a swap. The event happens to be a sporting event, but you could also have a swap dealing with the weather or any number of other things. And so there is a fundamental distinction between a sports bet, gaming writ large, let's say. Explain to me the difference between a sports bet that happens in Caesars and a sports bet or, well, you know, that happens. I mean, look, I understand you're in here. You're a very good lawyer. You're making these arguments. But admittedly, the waters have been muddied. And this happens all the time. I was general counsel for a company that our marketers go out and try and make all this money. And but they've said this is sports gaming, that, you know, the call sheet is involved in gaming. So it sort of undermines your argument that you're just making to me, which is, oh, wow, you go to you go to Caesars in Vegas. That's a very different species from what you're doing on on on Kalsh on North America Derivatives Exchange Act on the Crypto Exchange Act or sorry, BCM. Judge Nelson, if I could, I'd like to make two points in response to that. One is to explain the difference, but two is to explain why even if you think that sports event contracts are gaming, it doesn't matter for purposes of this case. So as to the difference sports bets, what happens at Caesars or what happens online, that is a bet against the house. The house is setting the odds sports event contract on a DCM. That's an open market with a financial intermediary that serves as a clearinghouse involving transact involving contracts between willing participants on both sides. Structurally, that is fundamentally different. In addition to that, sports council, I this is sophistry to the nth degree. I mean, it's still the house. I mean, what you call she not operating by regular. I mean, they're setting that they're setting this by how many bets come in. It's changing the odds in the same way that the house is setting the odds at Caesars. I don't understand how you can say that those are different sports event contracts can be used for a fundamentally different purpose. Sports event contracts can be used to hedge risk in a way that sports books cannot. And so sports books themselves can use sports event contracts to sell to hedge risk. Retailers that might, for example, have a promotion that rides on the outcome of a sporting event can use a sport event contract to hedge the risk associated with that. What you do at Caesars can't be used in the same way. But regardless, to get to my second point, even if you think that sports event contracts are Look at the special rule that Congress enacted as part of Dodd-Frank. Congress contemplated that the CFTC would have the authority to determine that certain kinds of swaps, including swaps involving gaming, that's the express language of the statute, would be contrary to the public interest and would not be allowed on DCM. And so if you're looking for an indication that Congress did contemplate the possibility that the CFTC would regulate gaming, it's right there expressly in the statute. OK, so let's talk about that, because the special rule is 40.11. The special rule is the statutory provision. It allows that. And then 40.11 is a regulation that the CFTC has probably. So here's one of the problems that I have. Every sport, every gaming contract that is going up on the DCM right now is contrary to the agreement that each of the parties have with the CFTC and with the CFTC's own regulations. Do you disagree with me? I do disagree. First, the CFTC itself doesn't think that 40.11 categorically bars sports event contracts. It's here supporting plaintiffs and a recent CFTC staff advisory refers to sports related event contracts as examples of event contracts listed on DCMs. The way 40.11 should be understood, 40.11C allows self-certification. The CFTC can then decide that a particular swap can't be listed. The reason it has to be understood that way. Whoa, whoa, whoa. Let's back up. Let's read it, because that is not and I think that's a fundamental problem with the Third Circuit opinion, because that is not what 40.11 says. 40.11 says prohibition, a registered entity shall not list for trading or accept through clearing any of the following. One, an agreement contract transaction or swap based upon an excluded commodity is defined in Section 1A.19.4 of the Act that involves, relates to, or references terrorism, assassination, war, gaming, or an activity. You just told me that they could put it in and then review it under 90 days. That's not true. It prohibits it from going on. The only way you get out of that is if you have a 90 day review and approval first before you list it. So, again, the CFTC hasn't understood it that way because they have contemplated in recent advisories that sports event contracts can be listed. Well, we'll hear from the CFTC and they can explain how the plain language doesn't mean what the plain language means and how it doesn't mean what everybody has understood it to mean for the last 12 years. A couple of points. One, I think what they may tell you is that sports event contracts aren't gaming. So it brings us back to that point. But if you think it is gaming, I think the other point on this is that treating 40.11 as a blanket ban would exceed the CFTC's authority. Because what the special rule in the statute allows the CFTC to do is to promulgate a rule prohibiting certain types of contracts, or prohibiting certain contracts, excuse me, that are contrary to the public interest. The CFTC hasn't made a public interest determination in Rule 40.11 that would allow it to reach this conclusion. The only way that it can ban particular contracts under the statute is to make that determination. So the only way to understand 40.11 is that it does, in practice, lead to that next step of CFTC review of contracts that have been listed. But doesn't, do you disagree with me that it says a registered entity shall not list for trading an agreement that relates to gaming? Now, maybe your argument is it doesn't relate to gaming. Is that your argument that the swaps we're talking about here do not relate to gaming? I think we argue that swaps don't relate to gaming, but I also think that... That's not the question that I asked, counsel. The swaps related to who's going to win the Super Bowl, how many touchdowns are going to be scored in the Super Bowl, all of these. Are you arguing that those swaps do not relate to gaming? We are arguing that, but I also think that even if you think they do relate to gaming, again, the special rule... Explain to me how those don't relate to gaming. They wouldn't relate to gaming if you understood gaming to refer not to a game, not to a sports event, but to a traditional game of chance. Roulette, for example, if you thought that that was gaming. But again, even if you do think that sports event contracts are gaming, I think that helps us under the special rule, because the special rule shows that Congress contemplated the CFTC would regulate gaming. And I don't think that the way to read 40.11 is along the lines that you were quoting, Your Honor, because again... You mean quoting the language? Correct. I don't think it can be understood that way. How should it be understood? It should be understood so that... What does it mean when it says a registered entity shall not list for trading? What does that mean? Tell me the alternate meaning of that. I think the alternate meaning of that is that a registered party can still list it for trading, certify that it meets the requirements of the statute because the particular contract doesn't violate the public interest. And it's that public interest determination that the CFTC is required to make under the statute before it can determine that a particular contract should be listed. And the CFTC hasn't made that public interest determination in this rule. If it's understood the way that we're talking about, then the rule itself is invalid under the statute. The way to read it instead... Have you made that argument that the rule is invalid under the statute? Have you challenged this rule? We have not. We don't... Has the CFTC proposed changing this rule? We have not challenged the rule. We don't think we need to challenge the rule. The CFTC hasn't enforced it in that way. And CFTC guidance has recognized just to the contrary that, in fact, sports event contracts are listed on DCMs. It's not taking enforcement actions against that. Again, to the contrary... What is your best case for a position that a CTFC guidance can completely undermine the plain language of a regulation? This went through notice and comment, correct? I believe so. Okay. Do you have any authority that a guidance issued by a regulatory body can state something that is diametrically opposed and totally contrary to the plain language of the regulation? I don't. But, again, I think understood that way, the regulation would be invalid, and that's not how the CFTC has understood it. Well, maybe it is invalid. Maybe it is invalid. If it's invalid, then why hasn't the CFTC... We'll hear from the CFTC. Why haven't they tried to change it? Look, I also think, regardless, whether 40.11 bans sports event contracts isn't an issue here. The issue here is whether the CFTC has exclusive jurisdiction on DCM trades, which, in turn, preempts state law over those same transactions. Whether or not 40.11 bans sports event contracts, that's an issue for the CFTC to address, not for Nevada to address. So, if I understand your argument correctly, we should not view this preemption as applying broadly to prevent the long tradition and history of states regulating gaming activities within their territory. So, instead, we should view these swaps as something other than gaming. You've described them as not the better against the house, but contractual arrangement that differs from gaming. Is that the distinction we draw? So, because I think what's a little bit troubling is the notion that all state gaming regulations are preempted. And I believe I heard you just say we don't have to go that far. Correct. Correct. And the other CFTC guidance that I would point you to in response to your question, Judge Beatty, the CFTC defines swap, I'm sorry, the CEA defines swap very broadly. It then directs the CFTC to further define swap. And in 2012, the CFTC did exactly that. It further defined swap and it drew a distinction between customary consumer transactions, which don't involve a financial institution. And I'm in swaps which are traded on DCMs and do involve financial institutions. And the reason that distinction matters and the reason why it makes sense is that Congress was concerned in Dodd-Frank with protecting transactions with regulated transactions involving financial institutions as intermediaries in the way that that does occur with sports event contracts. That does not occur with sports bets. It's that distinction between having a financial institution involved or not that further distinguishes sports event contracts from sports bets. And that follows from the CFTC guidance in 2012. And that's another reason why our argument does not extend to what goes on at Caesars, but it does extend to what goes on at a DCM. So there are also contracts that allow, if I use the term betting, it seems to be deciding the issue, but address the results of things such as elections. And the district court didn't address the election contracts. Do you think we need to? Should we do that in the first instance? Should we remand it for the district court to consider the implications for those contracts? So the cease and desist letter that we received from Nevada was focused on event-based contracts involving sporting events. And the preliminary injunction that we sought was also tied to that. So I don't think you need to go that far to address that. I do think it would be the same answer, though. These are event contracts traded on DCM and therefore subject to the exclusive jurisdiction of the commission. Thank you. Judge Lee, unless you have any questions, I know we've taken you over. We'll give you time for about. I appreciate it. Thank you. Good morning, your honors. We'll have him in on behalf of Cal. She and I'd also, if I may reserve three minutes for the bottle. I'd like to begin with the question that Judge Beatty, you asked my colleague with respect to sort of what the scope of our argument is. And I want to make clear that the scope of our argument is limited, right? We are not arguing that all state gambling laws are preempted. Rather, the argument is that these laws are preempted in the narrow application of regulating trading on designated contract markets. And for the reasons that Mr. Davreski noted, we think that that is clear just from the plain statutory text. So this is a case that we think rises and falls on the plain statutory text rather than sort of contortions of the statutory text based on policy arguments or intuitions about congressional intent that just aren't borne out in the text. So I do want to make that quite clear. Judge Beatty, with respect to your question about elections, elections are at issue in our case. And so while I think we, you know, our position here is modest, but I do want to make clear what that I think the implications of the state's position in our case are quite broad, right? So our case, we received a cease and desist letter from the state of Nevada saying that all sports related contracts are illegal gambling under state law and all elections related contracts are illegal gambling under state law. Even though we have a decision from federal district court in Washington, D.C., concluding that as a matter of federal law, we have the authority and right under the CEA to list those contracts on our exchange. And this is not hypothetical. During the course of the appeal in this case, the state of Nevada initiated a enforcement proceeding against Calshi in state court. And the theory at the origin of the case, the theory was that all event contracts were unlawful gambling, and they have since narrowed it to be all sporting events, all elections, and all entertainment events. So that is the theory. And that's because if you look just at state law, Arizona state law defines gambling to be betting on a sporting event or other event. So if they are right, that they can enforce state gambling laws, that state gambling laws are not preempted with respect even to trading on DCMs, then that means they can apply that state law definition betting on any event. And the implication of that would be that no event contracts are permissible, even on DCMs, and it may even be that no futures contracts are permissible. Because, of course, there is a long history in this country of states trying to regulate futures trading under state gambling laws. In fact, that's how many... But that's not before us right now, is it? I mean, let's try. I'm trying to figure out. Well, first of all, you mentioned events contracts. Is that only applicable to Kalshi? Because what we just heard from other counsel for crypto was either they're not doing political event contracts or there wasn't a cease and desist covering that. I think the difference is... I believe that the difference is that the cease and desist letter that they received from the state only referenced sport event contracts. But yours covered... Ours covered election contracts. And you do have in DC a ruling that says political events is different. Yes, it's different if not gaming is permissible on DC. I want to get back to a definition of gaming. I want you to tell me whether you agree with this statement or not. An event contract thus involves gaming if it is contingent on a game or game-related event. The classic example is a contract on the outcome of a sporting event. As the legislative history directly confirms, Congress did not want sports betting to be conducted on derivatives markets. An event contract therefore involves gaming if it is contingent on a game or game-related event like the Kentucky Derby, Super Bowl, or Masters Golf Tournament. Do you agree with that statement? So I believe that was a statement by Kalshi's counsel in the DC case. So while I do not agree with it, I think that Kalshi's counsel said it in the DC case. And nothing that we are saying in this case asks this court to disagree with anything that you just said. And here is why. So the key in that case was whether or not Kalshi's elections contracts were subject to review under the special rule. And we said they weren't. So the CFTC didn't have authority under the special rule to conduct a public interest review and then prohibit them at the end of the day. And we were distinguishing that situation from a situation where there were gaming contracts. But what we said in that case was that with respect to gaming contracts, the upshot was not that Congress outright prohibited them. And it certainly was not that Congress let 50 different states regulate them under 50 different sets of state laws. Sorry, when you say them, you're talking about election contracts or gaming contracts? The gaming contracts. So with respect to gaming contracts, the upshot of the statement was not that Congress prohibited gaming contracts. And certainly not that Congress allowed 50 different states to regulate gaming contracts under 50 different sets of state laws. Instead, the upshot, and this is a quote from the same, I think, brief that Your Honor was referencing, is that Congress, quote, empowered the CFTC to at least review the category of game-based contracts. So the whole upshot of that discussion was that the CFTC has the authority, under the special rule, to look at gaming contracts to make a public interest determination about gaming contracts and then make a determination that will be binding on DCMs nationwide. And that's the key. Because the whole thrust of the CEA is nationwide uniformity. That's why Congress did what it did in 1974 to create this uniform system to prevent the total chaos that would result from concurrent state by state jurisdiction. And so with respect to gaming contracts, Congress, I think it is certainly fair to say, recognized that there are public interest implications with respect to gaming contracts. And the solution that Congress came to was not to ban them and not to say that they aren't swaps, certainly. But rather to give the CFTC the authority to make a public interest determination about those contracts. And the key for our purposes is that they haven't. They haven't. The CFTC has that authority. We recognize that they have that authority. I mean, we've just gone through this colloquy. You say they haven't made, and I don't know what 40.11 means. I mean, to me, 41.11 means they have made a determination that these things are not in the public interest. I understand that, and I understand Your Honor's concerns. You disagree with that. I do disagree with it. And I disagree with it for a couple of reasons, Your Honor. And many of them were touched on by my colleague. But I really do want to make sure that our position on this is clear. I agree that if you look at Section 40.11a in isolation, that's the most natural understanding. 40.11c, though, seems to contemplate that there's the authority on the back end to make a public interest call and shall issue an order approving or disapproving the contract. But that hasn't happened. Approving or disapproving. Exactly, but it hasn't happened. So with respect to the adopting release, where this regulation was promulgated, the adopting release itself refers to case-by-case review. And if the regulation were understood to be the contrary, it would raise real, real problems with the statute itself. And the CFTC has not applied it that way. And the perfect example is the example of the CFTC's process with respect to our elections contracts, right? The CFTC looks at our elections contracts two years ago. They say, we think this is gaming. And then they issue an order that says the first 10 pages or so of that order are, we think this is gaming. And then the second, I think it's 12 pages, goes through and it has a careful analysis of why, in its view then, the contracts were contrary to the public interest. All of that would have been completely unnecessary. It would have been superfluous if 40.11 were already understood to be a categorical prohibition on gaming contracts. No, I don't agree with that at all. I mean, this doesn't strike me as difficult. 40.11 says, look, terrorism, assassination, war, gaming, we're not letting those go up. Why? Because this is self-certification. Nobody passes this off to the CFTC. The CFTC isn't reviewing any of these contracts. So it says, we're not going to allow any of these to go up. If you want them to go up, come to us, we'll do a 90-day review. And we will either allow it or we will disallow it. And if we disallow it, we'll tell you why. I know I haven't read what you wrote. I'm going to go, or just reference, I'm going to go read that. But that seems completely consistent with what I just outlined here, which is, no, that is contrary to the public view. So am I understanding that correctly? They did not allow those types of contracts? Right, and then we had the opportunity to challenge it and we won in court. That's right. So if you want to put up a gaming contract, which you said these are gaming contracts, to the DC Circuit. At a minimum, you said these are gaming contracts to the DC Circuit. I think that is a fair, I think that's fair. So, I mean, you're going to have to tell me how much daylight there is between what you said to the DC Circuit and 40.111, or excuse me, 40.11A1. But if that's true, then you should have, under the regulations, gone to the CFTC and said, hey, look, this is a gaming contract. We think we'd like to put them up. We'd like a ruling on that. And then you could have challenged it. But you didn't do that. Well, Your Honor, so let me, I want to take a premise of Your Honor's question and then I want to try to answer it directly. But the premise of Your Honor's question, of course, is that these are contracts that are subject to the CFTC's jurisdiction. They are contracts that are, they are transactions, agreements, or swaps in excluded commodities. I mean, that is the header of 40.11, of the regulation at issue. So I think even if Your Honor's questions, even if the defendant's arguments about these contracts are right, spotting you everything you just said, the upshot of that is that we may have a problem with our federal regulator. And the federal regulator, by the way, is revising the regulation, I think, in part because of the confusion that has engendered that we are, I think, is being ventilated right now. I looked through, and again, just make another note of a question that's coming. I looked through the 2026 proposals. I didn't see a change to this in there. Now, I might be missing it. I did not see a proposed change to this. My understanding, there's a reference to it in my understanding, but I'm also interested in this, of course, is that they are looking, again, at 40.11 in part based on the confusion that's engendered. Your point, which has some weight, is that even under, you know, my theory, that just means it's regulated by the CFTC. They're not allowing it, but it's still regulated by it. And basically, you can't, but the import of that is that everything that's going on in CSRS is illegal. Felonies are happening all the time in CSRS. No. So I do want to make absolutely clear that that is not, we think, how the statute should be read. It is certainly not our position. The only entity whose position it is, I think, in this case, is the defendants, not the CFTC or anyone who's making the preemption argument. Right? So there are a couple of reasons, and I want to make them quite clear. So the first is, in the text of the CEA itself, Congress drew a line between what is subject to exclusive federal regulation, which is on DCM trading, and what can be regulated by states, which is off DCM trading. And that's right there in the savings clause that the state of Nevada points this court to. Right? The savings clause. And this is where I struggle. So you're basically saying if it's on a DCM, we're good. It's CFTC. If it's not on a DCM, the state has full regulatory authority. But it's the same action. In many instances. It's the same action. And that's the disconnect for me. So I understand that intuition, Your Honor, and I know Your Honor had a colloquy with my colleague about it. I do want to push back on it. Right? I understand that it looks a lot to a layperson like it's the same. It really isn't. And the reason it isn't is because not because of the way that it looks sort of to an end user, but because of the way that these transactions are structured. These are structured like every other derivative. They are structured where Calshi, I know Your Honor suggested to the contrary, but I want to emphatically make clear, Calshi is an exchange in the same way that Chicago Mercantile Exchange is an exchange. In the same way that CME is not setting the prices of corn or grain or gold contracts or any of the other contracts it lists. Rather, it is bringing together buyers and sellers who sell and buy at market prices. Prices set by market forces. And that's really important because the CEA has an important price discovery function and feature, which is that part of the reason why we have derivatives is to allow hedging and the like, there's speculation involved too, but to have a price discovery function, to how likely it is the events can happen, how likely it is that any of these underlying events or commodities will go up or down. And that is the function of these contracts. And it's true with respect to the sport event contracts. It's, of course, sort of more obvious in the context of election contracts where election, you know, Calshi's contracts on the presidential election in the year 2024 were more accurate than polling. And that is part of the function of these contracts. And so in that situation, Judge Lee, go ahead. If I can interrupt. So that brings up the point and one of the definitions of swap under the statute says it has to be associated, event has to be associated with potential financial consequence. And how does sports events really, how are they associated with the potential financial consequence? I mean, it seems like whether the Yankees beat the Red Sox next week really wouldn't have a financial consequence. Oh, Your Honor, I think just as an empirical matter, that is not correct. And I understand the intuition and it's sort of all games. But sports in this country are huge, huge business. They're huge, huge business for the Yankees. They're for the Yankees sponsors, for advertisers, for the Yankees, for the television networks. But they will, but you get that revenue no matter what the Yankees win or the Red Sox win. People will watch whether, you know, whichever team wins, I don't think it affects the financial consequence. Oh, Your Honor, certainly. So, you know, if the Yankees win, if the Yankees do well, more viewers watch it. If a game is close, more viewers watch it. If the... The most valuable franchise in America is the Dallas Cowboys. They haven't won anything in decades. They're still the most valuable. Apologies to the Cowboy fans, but they've been terrible, but they're still the most valuable franchise. So I don't know if any single game or even series really has a financial consequence. Absolutely it does, Your Honor. I really want to make clear, and this is part of the reason why I think the fact that we are regulated by the CFTC is so important, right? We all come to this case with sort of intuitions about, you know, what the financial consequences of a particular game are. The CFTC, our exclusive federal regulator that looks at these contracts, has told this court that there are millions of dollars at stake, not with respect to whether a game occurs, but with respect to outcomes, with respect to individual player performances. There are bonuses involved. I mean, there are people on Cal sheet right now who are hedging sports-related risk because of the financial consequences for a whole range of stakeholders in these cases. And so that's why it's so dangerous to say, well, you know, 50 different states with 50 different sets of incentives to negotiate federal authority narrowly can come to a court, can bring a lawsuit in state court or even a criminal proceeding in state court, as the state of Arizona did with Cal sheet a few weeks ago, on the theory that, well, we don't think there are really financial consequences here. And so even though Cal sheet, your exclusive federal regulator, has told you that you are doing precisely what federal law authorizes you to do, we think that we are going to hail you into state court. And if we can persuade a state court judge or jury that there aren't really any financial consequences involved, that then you can be subject to criminal liability. That is the chaos that Congress soughts to avoid when it created the statute. Well, I sort of disagree with you on that. I mean, that's the chaos that's existed for the last hundred years. I mean, we've always had the understanding, and this goes to the presumption against preemption, which I actually don't subscribe to. You might like that, to hear that. It might be the best thing you've heard from me all day. But still, you know, this is quintessentially what states have been regulating. So I just don't understand the whole disruption. I mean, it sort of cuts the other way. Subliminally, something happened in 2010 that nobody really expected or thought about. Again, it can happen. But, boy, that's a pretty monumental change without a lot of discussion. Well, so again, I would refer your honors to what Mr. Dvoretsky noted, which is the reference in the special rule to gaming is a strong indication, I think, that Congress recognized that, you know, this could happen. And it set out a solution to that, and the solution was the CFTC. And the difference is, of course, states have regulated gambling within their borders for a long time. But they have not, since 1974, regulated derivatives trading on designated contract markets as gambling. That is one of the main things that the CEA in 1974 was amended to prohibit. That's the total chaos. And if you're in a world where, you know, we're talking about sports for the most part, but it's not just sports. It's sports. It's elections. It's other contracts. It's potentially all event contracts, and it's even potentially all futures contracts that states could then say, well, we think that's, you know, placing a financial position. Let me give you a hypothetical, and I know your time's up, so maybe I should ask the next one. But call she in the next round says, okay, we're going to put a video link to a roulette table at Caesars Palace. And you can bet on whether that's going to come up as red or black. You would say it's on the DCM. That's controlled by the CFTC. Yeah. I mean, that would certainly be gaming. I mean, that is gambling.     That's classic gaming. That's what we think Congress was. But you would say it was okay that you do that. And yet, the people who are betting in Caesars Palace are placing bets in person. And that's what I don't understand the difference, because, you know, it's the exact same activity that's  And one is happening now. I guess your argument is, well, the odds are different, because the House sets the odds for those bets. And so, you know, if you look at those people who are playing there, and those who are betting on call she, we've got a different algorithm that's setting up the odds. But that's the only difference in what we're seeing. It's the same ball. It's the same roulette table. It's the same guy putting it around. The structure of the transaction. So, I don't think I disagree with anything you said, except that, of course, the structure of the transaction on a DCM is different. So, the structure of any transaction on a DCM, any event  contract, any futures contract is market participants coming together, buying and selling at market prices. And, therefore, there is that price discovery element to that. And so, I'm not disagreeing, of course, that that is gaming. We don't offer that contract, because we think it, you know, is clearly gaming. And we think that the CFTC would not allow it. And the CFTC likely would not allow it. But the structure of the two is different. You said the CFTC would likely not allow it? My assumption is they would not allow it.   They would probably not allow that. That's right.  Why? Because I think that with respect to, well, I don't want to speculate on behalf of the CFTC. So, does it matter how the participants view the transactions? So, you had sort of proposed a slippery slope, where if this were not allowed on the DCM, then all futures trading on commodities could be in peril. But Kalshi advertises sports betting legal in all 50 states on Kalshi. So, they are pretty – in fact, I think I see one of these ads almost every day on my phone. And yet, it's a lost cause. I don't care about sports. So, you can tell them to stop sending them to me. But it seems like they are advertising this as sports betting, so that people who are participating think that they're engaging in gaming and betting, and perhaps are not as sophisticated as people who would traditionally be   involved in the trading on futures commodities. Does that matter?  I don't think it's legally relevant to the question here, which is what conduct does the CEA cover? What is preempted under the CEA? And of course, lots of things are colloquially called betting. You make a bet on the stock market. You buy a stock, and you make a bet. So, to Judge Nelson's earlier point, there are marketing people that always make the lawyers a little bit uncomfortable. But nonetheless, it doesn't matter. It does not matter for purposes of what the CEA preempts, sort of whether a particular market participant thinks of what they are doing as betting or not. And that is confirmed. That's just not just the case with the sports contracts,  You know, derivatives contracts themselves, even when there is a hedger involved in the derivatives contracts, this is what the Supreme Court noted in the Koran case that we cite to the court. The ability of derivatives markets to work is dependent on speculators, right, to provide liquidity to the market, so that there is something to hedge against  So, there are always speculators in these markets who are looking to make money. And we don't dispute that that is true with respect to these contracts, too. But that does not change the fundamental question of what is the structure of these contracts, where do they take place. They take place on a designated contract market, and there is, we think, overwhelming and powerful evidence that Congress did not want states to, 50 different states, to subject those transactions to 50 different sets of contracts.   of state civil and criminal laws. If there are no further questions, thank you. Yeah, we're taking over. We'll give you a little bit of extra time. Good morning, Your Honors. Anthony Ryan on behalf of Robin Hood Derivatives, and I'd also like, if I may, to reserve three minutes for rebuttal. I'd like to begin with the statutory special rule, Section 7A-2, because that rule confirms federal preemption here. Section 7A-2 sets out a two-part test, a two-part structure, and it asks first whether something's within the scope of the special rule. So that has to be an agreement, contract, transaction, or swap in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency. That's the statutory language. If, as the state argues here, if these sports-related event contracts are subject to the special rule, that can only be because they fit within the first part of that test, and that means, then, that there's federal preemption. That means that they fall within the exclusive jurisdiction of the CFTC in Section 2A. The state's argument here isn't a valid argument against federal preemption. It's not a valid argument for their freedom to apply what is federally preempted state law. It's an argument that the CFTC has gotten federal law wrong. That's what their argument actually is. Their argument is that under the second part of this test, which asks the CFTC to make a finding as to whether this is contrary to the public interest, their argument is that's what the CFTC should have found. But, obviously, the CFTC hasn't found that here, and that's where we get into the argument. Everybody keeps saying that, that they haven't found that here. But, I mean, what the heck does 40.11a 1 mean? So, for all the reasons that have been argued already, we believe that 40.11a shouldn't be the way Your Honor proposes. I read language. The language says it can't go up. I don't know how you can read it differently. Now, again, the elephant in the room is the CFTC is going to tell me, but it says it can't go up. And in a self-certification process, that makes sense. The CFTC is saying, look, you're self-certifying. You can't self-certify this. Before these types of contracts go up, you've got to come to us, and then we're going to tell you. Maybe it's in the public interest. Maybe it's not in the public interest. But we are going to put a gatekeeper on that to allow that to come up. And none of that was done. I mean, this would have been so much easier for all of you. I mean, you had billions of dollars on the line. Why didn't you go through Subsection C? So, in 2000, in the Commodity Futures Modernization Act, Congress created this self-certification regime. And so the argument here is basically that the CFTC should have stepped in, that they should have acted under 40.11. They should have blocked these. But that's a question about whether they're applying federal law correctly, not a question about whether federal law preempts state law. You signed an agreement that said, I will abide, my company will abide by all the statutes and all the regulations. If you thought that 40.11 should not be applied as written, now you've got an argument. You can tell it's not landing with me. You've got an argument that 40.11 doesn't mean what it says. I don't buy it. But I do buy that you may have an argument that maybe that shouldn't have been there. Maybe that was improperly adopted. Maybe it should be changed. Maybe it's unstatutory. But you never made that argument. You never went in and said, hey, notwithstanding this that tells us we can't list it, and we've agreed not to list it, we're going to go ahead and list it. And just, you look the other way. So that's shifting the burden, Your Honor, around the wrong way in a self-certification regime. No, it's not at all. In a self-certification regime, one that involves passive federal agency approval. That is, it's deemed approved after the passage of a certain time period unless they step in and take action. When that time period passes, it's legally deemed to be approved. That's final agency action. That is challengeable in an APA action. If the state or if casinos in Las Vegas don't like that these sports-related bank contracts are listed on federally regulated DCMs, they can bring a federal APA challenge. And that's what this Court's en banc Big Lagoon decision talks about, that we can't have a situation where states are making collateral. Counselor, with all due respect, we are so far away from Big Lagoon. I mean, it doesn't it's not even the same thing. I mean, you had the obligation. You signed an agreement. This is not difficult. You signed an agreement and said, we will abide by the regulations. In fact, regulations we don't even agree with. We'll abide by them. And if you don't agree with them, it's your job to say this was wrongly decided or you could go through the subsection C process, go through the 90-day review. They may allow you to post it. Then you have a better argument. Or they may allow you not to post it. Then you have the regulatory challenge. But to say that Nevada has to come in when the regulations clearly say you can't post at all. It's very far apart from Big Lagoon. So I would point to 40.2 and 40.3, which are regulations that explain how this case-by-case review process works within the self-certification regime. And this is why in the 2011 release adopting the regulation 40.11, why in there the CFTC referred to a case-by-case review. So DCMs are allowed to self-certify. DCMs here obviously read 40.11a differently from how Your Honor reads it. No one's come up with a coherent English reason why that shouldn't be. It says you cannot self-certify and post it. There are good arguments, Your Honor. One is that it's not gaming. So that when you look at the list, this is the argument that the District of D.C. made, or the finding the District of D.C. rather, made in its 2024 decision involving election-related matters. I'm glad of the call. She just acknowledged it is gaming. I guess that doesn't mind you. So maybe we'll rule differently for you. So there's a big difference between a TV camera pointed at a roulette wheel. That is gaming because the underlying is gaming. So any time that we analyze derivatives, there's an underlying and then there's a derivative on the underlying. Here the underlying is a sports contest. That's playing a game, but that is, I submit, not gaming the way that term is understood. Gaming to mean gambling. Do you disagree with Kahl's statement to the D.C. Circuit in 2024? I do, Your Honor. Yes, I do. And so there are two separate reasons why this conduct doesn't fall within 40.11. One is the meaning of the term gaming. The other is reading 40.11A in conjunction with 40.2, 40.3, and 40.11C, which all set out a case-by-case review system that allows self-certification. But even if I'm wrong about all that, even if this Court believes that these sports-related event contracts violate 40.11A, that doesn't affect Federal Preemption 1 IOTA, Your Honor. It's still preempted. It just means that the CFTC is then supposedly getting federal law wrong. That doesn't somehow provide freedom to apply preempted state law. What it means... What it means... Well, yes and no. I mean, your whole argument is hinged on, are you on the D.C.M.? If you can't go on the D.C.M., then what are you regulated by? You either can't do the activity at all, or you're regulated by the state because you're not on the D.C.M. under my reading of 40.11A.1. Well, Your Honor's reading is that we're not properly on the D.C.M. The fact is that we are on the D.C.M. These are transactions that are being traded. They're being listed and closed every day on the D.C.M. The CFTC can take action any day that it wants to, and it hasn't. That can't be a serious argument, because it's self-certification. You can put anything up you want. You can put up insurance policies on there. You can put up so-and-so is going to die in the next five years. Maybe you already do this. I'm assuming that that was... I guess it's only assassination. As long as they're not assassinated, I suppose you can put it up there. You could say, my colleague is going to... You have insider information. He has cancer. You put it up there, and you can say he's going to die within the next year. Your position would be, hey, it's up on the D.C.M. We can do whatever we want. There's a whole very complex set of CFTC regulations that govern what D.C.M.s and what F.C.M.s, as Robin Hood is. You are at F.C.M. Correct, Your Honor. Can I just ask quickly, what is the difference? Basically, you don't have your own D.C.M. You have to post on Kalshi's. Does Kalshi make a cut? Do you ever go to Kalshi and say, hey, we want to put this up, and Kalshi says, no, you can't do that? It's the D.C.M. here at Kalshi that lists contracts. Robin Hood is simply offering those contracts to its customers the way, for instance, a securities broker might operate. Robin Hood's not putting contracts up on the D.C.M. itself. But there's a whole set of these complex rules, and a D.C.M. that flouted those rules and that put insurance contracts or assassination contracts up, they would risk getting into trouble with the CFTC. They would risk having their license pulled. Well, not very much, because everybody's putting up contracts that violate 40.11A and nothing's happening to them. Because the CFTC believes that they don't violate 40.11A, and so that's how we get back to this question about the internal contents of what federal law is as a distinct issue from whether federal law preempts state law. I'd just like to say one error that the court made below that we haven't touched on yet, I just want to say one word about, is the irreparable harm argument as a matter of law any time a company like Robin Hood is put to the Hobson's choice of either not doing business or of losing money from that or having state law, civil or potentially even criminal law enforced against it, that constitutes irreparable injury as a matter of law. So the court erred in that finding. Your point there would be, however we rule on the merits, you still have irreparable harm no matter what. Yes, and the idea that this was somehow self-invited, that's both a legal error, it's contrary to Supreme Court precedent about people who are bringing preemption actions facing this Hobson's choice, and it's also simply factually wrong. There was a seven-month period in which there was an injunction in favor of Calshi in place. Robin Hood entered the market in August during that time. The state could have taken an appeal at any time to this court. They had seven months where they could have taken an appeal under 1292A. They chose not to because obviously they didn't believe their sky-is-falling arguments. They didn't believe that everything was somehow falling apart and that they couldn't regulate state gambling anymore, or else they would have come to this court in April. Thank you, counsel. Thank you, Your Honor. I guess now we'll hear from the CFTC, right? We might need to give you more than six minutes. Thank you. Good morning. May it please the court. I'm Jordan Minoff of the CFTC. I'm joined by my colleague, Carla Metzger. Our ears have been burning for a little while, so happy to talk to you. Your Honor, I want to start with the 40.11 issue, but I want to raise first two threshold issues. As Robin Hood's counsel was just getting into, we disagree with Nevada's interpretation of 40.11, and it sounds like the interpretation that Your Honor is leading towards, but even if that's true, then they are conceding that these are swaps that are under the CFTC's exclusive jurisdiction. Because a swap, an event contract may or may not violate 40.11, that does not transform it into no longer being a swap and putting it under the state gaming regulator's jurisdiction. It is still under the exclusive jurisdiction of the CFTC. It just can't be listed by a default. That gets back to, then, is any state gaming remaining? Yes, Your Honor. The CFTC has never taken a position that existing transactions that state gaming regulators regulate fall under our jurisdiction, and we've never made that argument. But the second threshold point that I want to make as we get further into this is that the CFTC last month released, in addition to the staff guidance letter, released an advance notice to propose rulemaking that broadly covered event contracts and disk space in general, and we anticipate that that may result in multiple rulemakings, including some clarification on the 40.11. If that wasn't a proposed rulemaking, that was just seeking comment on what the rule should be. Am I correct about that? Mostly, Your Honor, yes. It's an advance notice of proposed rulemaking, so it's our first step. We're still soliciting comments, including from state stakeholders. And how long is that process going to take, and what do you envision it looking like, or you don't know yet? Off the top of my head, I believe the initial comment period was either 30 or 45 days. I think it's 45 days. And then we review comments and move from here. Obviously, our goal would be to move quickly because these markets are quickly developing. This issue is extremely live, and we would like to give both the markets, the states, and the public some guidance on this. Is there anything in there? I couldn't see enough as I went through it on 40.11 specifically. I guess that doesn't mean you couldn't propose a rule out of the advance, but did you address that specifically? I don't believe that the ANPRM references 40.11 by name, but obviously it is included in the general nature of the questions that we asked for comment on. A third point, which is less of a threshold point, but I think important, is that in our view, Nevada's arguments boil down to what this DC Circuit rejected in the Cal sheet decision, which is saying that the transaction when viewed as a whole constitutes gaming. That's not true. We agree with the DC Circuit's interpretation of the special rule to mean that a contract involves when the event at issue is the activity. It is not looking at the contract and seeing if it equates to gaming. That is not what the special rule is intended to do. That's not what 40.11 is intended to do. I'm happy to answer any more questions. I don't think you answered the big one, which is how does a regulation that says you cannot post this allow them to post it? Thank you, Your Honor. I agree with what the private plaintiffs have said that the CFTC does not think that a sports event contract, much like a political event contract, constitutes gaming for the purposes of the special rule or 40.11. Like I was just saying, it has to involve the underlying activity. Take an assassination, for instance. You could not have an event contract that is predicated on whether or not an individual is going to be assassinated. That would be barred by the special rule and 40.11. We take gaming to mean casino gambling and that sort of activity. It does not mean an individual sporting event or outcome. You would not, for example... You mean casino gaming. You go to a casino to make sports bets. You very well may, Your Honor. You do. Yes, absolutely. You're over to the CFTC. You're supposed to know all there is about gaming. We don't regulate gambling, Judge Nelson. That's my point. An example of a prohibited contract, for instance, was you could not have an event contract that is predicated on the underlying event of whether a particular roulette wheel roll is going to land on red. That would be an event contract based on gaming. That violates our core principles and that's the reason that it violates the public policy that underlies... How does that differ from having an event contract based on who wins or loses a particular game? Judge Beatty, I would say there's a difference between... Regulation and statute say gaming. It does not say games. After, for instance, Steph Curry played a basketball game, you would not ask him how the gaming went. In that sense, you would say that you went to a casino to participate in gaming. In that sense, they are different. Again, because we've had a lot of discussion about the colloquial use of these terms and you might colloquially say you're taking a bet on Apple, but we don't think that those align with the statutory text or the regulatory framework and that's why we're initiating rulemaking. If gaming under 40.11 includes sports betting, 40.11C, the 90-day review process, probably as a practical matter, it would be probably too difficult to have sports betting under that provision, right? Because, I guess, would every event, every game have to get 90-day approval? I want to make sure I understand the question, Judge Lee. So, just to clarify, the CFTC doesn't think that... We have made no effort to regulate sports books. We don't think that 40.11 has any application to traditional sports book games. I understand. I'm saying that Judge Nelson suggested well to the private planners. If you wanted approval, you could have gone to CFTC under the 90-day approval process under 40.11C. I mean, is that even as a practical matter possible? I mean, for each event, each game, I assume they would have to ask the CFTC to approve. So, whatever 162 games for each team in baseball or whatever, 82 games in basketball, 17 games in NFL, each permutations, you would have to submit that to the CFTC to approve because each one is a single contract. Is that how it works? I think that's possible, Judge Lee. I think if you were to adhere to Judge Nelson's hypothetical readings of 40.11, but to be clear, we don't think that that's the proper way to read 40.11. The 90-day process does work, and it's open to our DCMs for instances where they would like prior approval. I think the question is would it have to go contract by contract, or would it go subject matter by subject matter? I mean, could they come in and say, hey, we want to offer sports gaming and tell us whether we can do sports gaming, and then you'd have 90-day review to say, yeah, sports gaming is okay, then everything would be okay going forward. Then all 100 or 1,000 games would be okay. Or would they have to do that on their own?  Can you give us any examples where subsection C has been used at this point? I can't off the top of my head, Your Honor, but I'm not sure if they would have to go transaction by transaction or if they could have some sort of categorical relief. I'll also point out that it's not the only tool in the CFTC's toolbox. As generally we make the point in our brief, the CEA and the authority granted to the CFTC is meant to regulate an extremely complicated and complex set of markets, and rules under 40.2 and 40.3 that relate to self- certification also allow they require the DCMs to follow lots of different rules about self-certification, but they also provide tools to the CFTC to, for instance, ask for more information about particular contracts, particular types of contracts, and engage in sort of informal conversations with our regulated entities to ensure that they comply with the entire set of regulations. If I may just make one more quick point outside the 40.11 context, I want to emphasize that the rule that Nevada is asking for here, they argue that the CFTC is asking for a CEA change. We are simply trying to regulate event contracts as we have done for decades in a new set of areas that's developing. What they are asking for is the CEA change. Under their ruling of the CEA and what constitutes a swap, a number of products that we have regulated for decades, including event contracts on the weather, would be in jeopardy. There's no limiting principle in their reading of the plain text of the statute. They haven't challenged that, though. That's right, Ron. They haven't challenged it here, but there's nothing in their reading of the CEA that would indicate that. No, it seems to me that there's a big difference between that, because weather falls under a different... I mean, weather is historically what was regulated by CFTC and its predecessors. That's right, Judge Nelson. Their reading of the CEA and their appending of extra-textual lines within the CEA's jurisdictional provisions and definition of swap means that there's no reason that they couldn't at a later date say that contracts on the weather are gambling according to their interpretation of the text. I just want to emphasize that our reading requires no textual manipulation of the statute. You can just take the statute on its face. We can go forward with our rulemaking to offer clarity, and these markets can function in a clear way in the future. If the Court has no further questions, thank you very much. Good morning, Your Honors. I'm Nicole Saharsky for the State Defendants and the Nevada Resorts Association. What we're talking about, what plaintiffs and the CFTC are urging, is a severe intrusion on state sovereignty, because the consequences of their position is that all sports bets would qualify as swaps, and critically, the CEA, Section 2E, requires that all conservative    consumer swaps be traded on DCMs. That would suck in all sports betting as we know it and make the CFTC the nation's gaming regulator. Let me push back a little bit on that, because it's not entirely clear to me what we're talking about here. You could envision a world in which some sports bets fall within the definition of swap and therefore fall under the CFTC regulations, and some do not. I suppose it depends on whether there's economic impact based on that. If you're going to go in and bet, what seems to be more traditionally regulated by the state is the Raiders are playing in the Super Bowl. The Raiders, are they going to win? That seems to be quintessential. What color is the Gatorade that is going to get dumped on the coach at the end of the game? That seems to be a little bit less in the traditional wheelhouse of state regulatory gaming. With that understanding, how do we approach this? Is this an all-or-nothing deal, or should we say, some of this is clearly in the state regulation. Let's let the state regulatory enforcement action go forward and see what happens out of that. A couple of thoughts. I think the way we resolve it is from the text of the CEA. I'm going to walk through the text and explain why the definition of swaps doesn't allow the distinctions that they're suggesting. More broadly, to answer your question, which is, how should we resolve this, and should we let the state enforcement action go forward, this is a preliminary injunction case brought by the plaintiffs. Their position is that the state can't touch anything, sports bets or anything, that's on their DCM. The burden is on them to show a likelihood of success. If they don't meet their burden on a likelihood of success, I think that ends it, particularly as Judge Gordon explained, with a very strong state interest, the harm to the gaming industry, the other preliminary injunction factors. To directly answer your question, I understand plaintiffs have tried to draw some lines. They say, our sports bets aren't like other sports bets, and we don't have a house. Truth to that, though, right? None at all? Because it does seem like the odds are set slightly differently. I don't know if that's a meaningful difference at all. You're talking to somebody who is not a rampant gamer here. But explain to me why the house bet is the same as what they're doing. I think there are two parts to this. One is that it is the same, and two, that it doesn't matter to the definition of swap. These differences that they're claiming about traded on a market or not on a market, house versus no house, that's not in the definition of swaps. But let me address your first question, which is, how are they different? They're not different in practice. What's the over-under on a game? Here's a prop. Will there be a touchdown in the third quarter? They offer contracts on what color will the Gatorade shower be? Any kind of parlay you can put together, which is a combination of multiple bets. Will the Packers win on the same day that the Bears win and the Bulls score 35 points and Alex Ovechkin scores a goal? These are sports bets and, as Judge Gordon said, everyone who sees them knows them. Now they say that they're different in practice because there's no house. That's not true, at least for some portion of the bets, because Kelshi and Crypto both have what they call affiliated market makers. Kelshi's is called Kelshi Trading, and those exist so that if there's not someone to bet on the other side that they can take the bet, because there might not be someone waiting to bet on a four-way or a ten-way or whatever it is parlay. So they do have affiliated market makers. Second, gambling doesn't require a house that you bet against. There are all different kinds of gambling, like lotteries, where the casino just takes a cut of it and you're not betting against a house at all. So this idea about is there a house or not a house, I don't think it's right factually. I mean, they acknowledge that they're doing sports betting. Kelshi acknowledged it in other litigation. They advertise it as the first legal sports betting in all 50 states. I think it just strains any meaning to say that it's not sports betting. But I want to address the second part of your question, which is like, does it matter? Because I think maybe the discussion has gotten a little bit away from the definition of swaps and the interpretation that we're offering as opposed to the interpretation that they're offering. And the interpretation that they're offering, the problem is it has no limiting principle. Any event that happens that could have any financial consequence in their view counts as a swap. And that is a real problem because of Section 2E, which says it shall be unlawful for any person other than an eligible contract participant, which are defined as like financial institutions, government entities, banks, there's a whole list, shall be unlawful for any person to enter into a swap unless the swap is entered into or subject to the rules of a board of trade designated as a contract market under Section 7 of this title. So if these things are swaps, the consequences are huge. They're huge. And that's why not having a limiting principle on plaintiff's side is a real problem. Now, the Third Circuit said, well, but that, the majority in the Third Circuit said, yeah, but you're just, you're piling inferences upon inferences. That's not the issue here. The issue here are these discrete contracts. Could you address that? Sure. I think the problem is that the Third Circuit said, we're not going to address the consequences because Kelsey didn't make arguments about the consequences. But of course they're not making those arguments. It's the state that's making them because the definition has no limiting principle. And I mean, you can ask them, what's the limiting principle? What couldn't you list as a swap? Roulette wheel, sure, coin flip, Gatorade color, you know, anything else. And so I think Judge Gordon found a much more sensible way to look at the statutory language. And I think it's not just the definition in Part 2, but other indications of text that kind of all point us in the same direction. And so I just want to go through those because I think it's important and there's four indications of the text here. So first, we start with the definition itself in Romanette 2. And it doesn't say it's based on any event, but only those that are associated with potential financial, economic, and commercial consequences. What does that mean? It means an event with inherent business risk. Like if it occurs or not, someone's going to make or lose money, and they're going to buy a contract to hedge against it. But maybe you say, well, you know, that could be read more broadly than that. How do I know? Two, the context confirms it. This is just one part of a six-part definition of swaps. And if you go through the other five parts of the definition, they all involve financial instruments where there's an underlying commodity. It could be corn. It could be interest rates. The value's going to go up or down. And so the companies enter into a swap to the risk about whether that's going to go up or down. And as kind of a broader context point, you can look at the findings and purposes of the CEA itself. This is in section 5A. The transactions subject to this chapter are entered into regularly in interstate and international commerce and are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair, and financially secure trading facilities. Are we trying to figure out the prices or risks based on, like, whether Steph Curry scores a three-pointer in the third quarter? That's not what this act is about at all. So I just plan on... If I can interrupt here. But if we look at the special rules in the statute, it explicitly references gaming and says CFTC may. It doesn't say shall. It says may ban those. So based on that statutory language, if the CFTC rescinded 17 CFR 40.11, should the private plaintiffs prevail then here in this case? No, because the special rule is not a grant of authority to the CFTC to regulate gaming that preempts all state gaming law. And it has been understood, and this is through the text of the special rule, and they undertook a rulemaking in 2011, formal notice and comment rulemaking where they explain this, that it is a backstop provision. It doesn't just apply to swaps. It doesn't define them. It applies to any agreements, contracts, transactions, or swaps that are against the public interest because they involve these categories. The idea was we need to have a backstop provision that if someone starts listing stuff that's against the public interest, you don't have to determine if it qualifies as a swap or whatever. Just take it off because that's not what these markets are for. And the statutory language uses may disallow. It doesn't say shall. If it was a backstop, Congress presumably should have said shall not allow them. It says may, so it seems like gave the discretion to the CFTC whether to accept it or not. Or at least it seems like it's not forbidden under the statutory language. Yes, you're correct that that's the language Congress enacted. Now, of course, it has been understood. They have enacted or promulgated a rule that addresses it as a blanket proposition, but I don't think that that answers the question about whether state law is preempted. It says that on DCMs there's some stuff that seems like it's against the public interest and the CFTC may take it down and the CFTC says we're going to do that as a categorical matter in section 40.11, but that doesn't answer the question about what the states can do. Wait, wait, wait. I think it sort of would answer what the states could do because if gaming were specifically allowed and were allowed on the DCM to be listed, then I think they have a pretty good argument that it's exclusive jurisdiction. That's the whole problem here. They seem to be saying, well, if it's on the DCM, we get to do it. If it's not on the DCM, the states get to do it. I have a hard time with that argument because it's the same thing that's being done. You either can do it on the DCM, in which case you can't do it. The states can't regulate it because it's exclusive jurisdiction. I don't understand your theory that, well, we could allow it on the DCM but the states could still have authority where there's exclusive jurisdiction. Sure. Let me explain that. The special rule doesn't give the authority to regulate gaming to the CFTC in the same way it doesn't give the authority to regulate terrorism, assassination, or war. It may give them that authority if they decide that they have it. Right, but it doesn't answer the question of whether these contracts are swaps in the first place. It's not defining swaps and it's not limited to swaps. It doesn't assume that they're swaps. It applies to agreements, contracts, transactions. You're saying this could be, gaming could be, oh, I see. You're saying if gaming's allowed under Section 2 or under the special rule, it could be allowed not through a swap but through just some contract generally and therefore there wouldn't be exclusive jurisdiction because exclusive jurisdiction only occurs with swaps, not with other contracts outside of swaps. Right. I mean, we think of the special rule provision as the ability to take down as opposed to any affirmative allowance, but I think your point is the same one I'm making, which is it's not defining swaps. It's understood to be a backstop or a belt and suspenders provision that allows you to take down something that's against the public interest without a finding that it's swaps. And so it does not address the authority of the states. And so I want to go to the other question that I think you asked, which is, okay, if I do think it's a swap, as I take the question, why wouldn't there be preemption here? And I think the answer is, you know, we have to start, first of all, with a presumption against preemption. And I don't think that that comes from just some, like, presumption in the air. I think this, everyone recognizes that gaming is a traditional area of state regulation. The Supreme Court recognized that in Murphy, and in particular recognized the importance of the states being able to make their own judgments, because Nevada, for example, has made very different judgments from other states, including Utah, which doesn't allow any gaming whatsoever. And that is going to be completely overridden if, you know, plaintiffs prevail in this case. So you start with... What do you say to a judge who reads the case law and says, as Judge O'Scanlan had said just a couple of years ago, this presumption against preemption, we don't know whether it even applies, when it applies. It's sort of a made-up rule. Half the justices don't agree with it. Half the justices don't play it consistently. What if... Do you still win if we don't adopt the presumption against preemption? 100%. And I'd like to talk about the other reasons that there's not the preemption here that is claimed. But it's not just a presumption against preemption. I think there's a lot of reasons that there's a very heavy burden for the plaintiffs to overcome that they would need to show something extra clear in the CEA to take away the state's power over gambling. And so putting aside the presumption against preemption, the historic federalism interests, you've also got the major questions doctrine. Can you talk a little bit about the major questions doctrine? Because I guess the theory there is that Congress and the Dodd-Frank bill would have had to speak more clearly to this issue if it intended a regulation of this magnitude to supersede state regulation. Is that the basic understanding? 100%. This would be a sea change. It would be a huge deal. It would take away the power from the states. It would have these financial consequences. How much financial consequences are we talking about? Well, for the state of Nevada, it's like a third of the general fund that comes from gaming revenues. How much are we talking about overall? Because, I mean, this is one of the debates that goes into the major questions doctrine. Are we talking about $20 billion or are we talking about $100 billion? I think we're talking about billions and billions, and I don't think the exact amount is what matters. I think what the Supreme Court said... I think the Supreme Court has suggested that it does matter. I mean, that's the whole point of major questions. And I don't know that we know the answer. My recollection is $50 billion was sort of enough to trigger it. And I'm trying to figure out whether we're talking about that kind of money here. I don't have an exact number. The numbers, I think, are significant when you're talking about the interests of all of the states here. And, of course, it's not just a money interest, but there are serious sovereignty interests here. I mean, this bleeds a little bit into the federalism interest, but this is a core police power that the states have to regulate the health and safety and welfare of their people. You know, the Supreme Court said the states get to make these determinations about what to do on the issue of gambling. So if the question is, is this an important national interest? 100%. And in the major questions doctrine, I think what the Supreme Court was focused on in cases like West Virginia, that EPA versus West Virginia case, were concerned about if the government claims to discover in a long-extant statute an unheralded power that would represent a transformative expansion of regulatory authority. That's exactly what we're talking about here. Well, yes and no. Part of the problem is, I mean, I don't think they're arguing that this crept in any earlier than 2010. So it's not exactly like this has been some government power that came in with the Grain Act of 1912. This is something that came in with the Dodd-Frank amendment in 2010.  that's where I'm sort of struggling. I mean, look, we're all struggling with the major questions doctrine because nobody knows what the heck it means. But it's not entirely clear that this fits within that bailiwick or not. Because at this point, we're talking about something that's existed for a decade, not hundreds of years that somebody just brushed off the dust off of some old regulation or statute and said, oh, let's try this. Okay, well, a couple of points here. First, I will answer your question about the major questions doctrine, but I don't think it's just that. I think it's also these federalism principles. I think it's also an implied repeal problem, which is a serious textual problem when you've got several federal laws that depend on states defining gambling and you'd be taking all that power away. The Wire Act, the Indian Gaming Regulatory Act, etc. And I don't know whether I buy their argument, but their response to that is, no, we're not doing anything to state regulation. You guys go regulate whatever the heck you want. If it's on a DCM, we handle it. If it's not a DCM, Nevada, go about its business as usual. At least that's how I understand their argument. I understand that they're saying that, but I don't think that that's textually coherent. And I think the reason it's not textually coherent is because their definition of swap would sweep in all sports betting because all of them are on the same events and outcomes and have the same kind of consequences that they're saying counts. And then Section 2E, which is that provision I read before, it shall be unlawful to not have those on DCMs. And so the folks who are doing casino betting now, they have to be on DCMs. So it does put everything on DCMs and it does take away the authority, and that's why the states here, that's why the states have filed an amicus brief saying this is a severe front to state sovereignty. This is at the core of the state's police power. This is a huge problem, and that's why I guess I was saying the major questions, doctrine, federalism, implied repeal, no elephants in mouse holes, all of these principles of textual interpretation tell us we got to have something super clear to know that Congress wanted to take away the state's authority as opposed to concurrent regulation. And of course, from 2010 until 2025, Dodd-Frank Act, no one thought that the Dodd-Frank Act was having the implication of legalizing gambling as long as it was on a DCM and making the CFTC the nation's sole gaming regulator. I mean, it would make the Supreme Court's decision in Murphy a nullity, and the Supreme Court was very clear, you know, it's the states that get to make the decisions on gaming there. Wouldn't maybe perhaps we could apply the major questions doctrine to have a more narrow reading of the preemption, that is it only relates to gaming on DCM. It won't preempt, you know, Nevada state laws so they can have, you know, gaming casinos. Maybe that would be the better, perhaps a more narrow reading of it, applying the major questions doctrine. But what I'm saying, Judge Lee, is that we have to be faithful to the text of Section 2E of the Commodities Exchange Act, which says that swaps have to be on DCMs, so consumer swaps. So if their contracts qualify as swaps, they have to be on DCMs. So this goes back to the point I was trying to make about the definition of swaps and trying to stick to the text as opposed to some of the distinctions that they're drawing. You know, we talked about I'm sorry to interrupt you. But you said a few moments ago that or I think I heard you say that you would no longer have in-person sports betting in casinos or some other form of like sports book, online sports betting, that everything would have to be on the DCMs. But why is that the case? Why would there not be two different venues for this to occur? Right. So this is the question is, are sports bets swaps? And we've had some discussion about the definition of sports bets and how under their view, they believe that any sports event or outcome has financial consequences that count. And then we look at, and this is a provision I think they ignore in their textual interpretation, section 2E, which says, it shall be unlawful for any person other than an eligible contract participant to enter into a swap unless the swap is entered into on a DCM. And so if it is a swap, the consequences are immense. A consumer swap, there's this exception for eligible contract participants, which are banks and financial institutions. But the fact that there is an exception in there that's specified means there's not other exceptions, right? That's just a basic principle of textual interpretation, which means it shall be unlawful to do these things unless they're on the DCM. And that's why I think they're on exchange versus off exchange distinction just breaks down because of this provision, section 2E, which I think plaintiffs ignore. That is the problem. That is the problem there. I would like, though, to more directly address, because I'm not sure that we really got through all of it, a response to Judge Nelson's question about if these are swaps, would there be preemption, and would we find the necessary clear intent? We talked about whether we'd start with a presumption or not, and I think probably folks have the arguments on that. But I want to talk about textually what we'd expect to see preemption and why it's missing here. And if you look at the text, there are express preemption provisions in section 16, like section 16E2, which is a provision that preempts some gaming laws in very narrow circumstances. Congress expressly said when it wanted gaming laws to be preempted, and no one says that that narrow provision applies here. There's also an express preemption provision that's for insurance contracts, and that shows when Congress wanted to preempt something that was traditionally in state law, it said so expressly. I think also the special rule, which we've discussed a bit, preserves state law. I've explained our understanding that it's this backstop provision to take things off DCMs, and in addition to prohibiting gaming, it also prohibits conduct that's unlawful under federal or state law. So this is saving another provision that's saving state law. Wait, the special rule does that, or 40.11 does that? Both of them. They use the same language. The special rule gives the commission the authority to ban it, and then 40.11 does categorically ban it. Just going to your earlier question, by the way, Your Honor, this question, if you're curious about what 40.11 means and whether it's categorical, I don't think you need to guess, because there was a formal rule making on it. It's many pages, and the CFTC explains over and over and over again that it is a categorical prohibition, and they explain how they made a public interest determination, and they explain why. I understand that the CFTC is here today saying different things. They didn't acknowledge section 40.11 at all in their brief. It's not noted. But it also allows for exceptions under subsection C. Well, section C allows case-by-case determinations, which the rule making explained is to figure out if something falls within the categories or not, not something that is gaming and you take it out of it. But I think even if you viewed it differently, it doesn't stop. And I guess at least some of the appellants are arguing, well, we never even had to use C because this isn't gaming. Everybody knows it's not gaming. Koshy has a little bit harder time with that argument. But the others say, well, this isn't gaming. Okay. I think it is under any definition of gaming, including the long discussion of it. I know you do, and I know 90% of Americans do, but sometimes that 10% is right. Well, let me give you some other indications of what gaming means. You've got Supreme Court decisions that say that gaming is gambling. That's the way that state law defines gambling. The rulemaking, the 2011 rulemaking that put 40.11 in place says that gaming is gambling and then has a whole bunch of footnotes that reference state law and explain that that's what it's talking about. Your point is, it is enough of a close question in your mind, not a close question, but at a minimum enough of a close question that they needed to use subsection C to figure this out. If there was... It says it's a blanket prohibition. If they could try to claim an exemption, maybe that would be one thing. I still don't think it answers the question about whether federal law is exclusive here. I think if they repealed or got rid of section 40.11 A tomorrow, they would still have a problem, which is the lack of the necessary clear intent in the text of the CEA themselves. But I do think... Well, I'd like to discuss the reasons on that, but I guess what I would say is, I think 40.11 provides an easy way to say that there's no preemption here. You can't claim that federal law gives you protection from state law if you're not allowed to do the thing. You're not allowed to be on the DCM. You can't say there's a conflict with federal law if federal law says you can't do it. You can't say it's an obstacle to federal law if federal law says no. Can you give me some insight into the Third Circuit Majority's discussion of 40.11 because I did not understand it. They seem to say that... I just didn't understand what they were saying, what 40.11 meant. Maybe I'm asking too specific of a question. I don't even know that there was a discussion. There was a citation of it that I found confusing because I would have expected more of a discussion of it, but yet it wasn't there. So I'm not sure that there's anything more to explain. There was a citation of it, but I don't think there was any grappling with it. I think the Third Circuit decision, just while we're talking about it, I think also didn't grapple with the context, like the other parts of the definition of swap, Section 5 about the findings and purposes. It didn't grapple with the presumption against preemption, which we think is important, and it didn't grapple with some of the important consequences of plaintiff's position, saying we don't have to deal with those consequences because Calshy didn't argue them. Of course, it's the argument of the state that those are severe consequences that are intruding on the state's sovereignty, the tribe's authority, etc. But just to go back, because I want to make sure that we have a chance to address it, which is you say if we're trying to answer the question about preemption, how do we look at the statute and how do we know that the states would have been allowed concurrent authority here? We already talked about the express preemption provisions, including one that addresses gaming, which suggests that's as far as Congress wanted to go on gaming. There's also no comprehensive regulatory scheme here to address gaming. The CFTC has never regulated gaming. They said in 2024, we don't believe we have the statutory mandate nor the specialized experience to appropriately oversee gaming. There's just nothing like the kind of very detailed regulation of gaming that occurs in the states, and you've got an amicus brief from the North American and international gaming regulators that explain what that entails. It's not what the CFTC does, which is how do markets work. It's protecting the public from some of the problems with problem gaming, with underage gaming, with potential criminal elements. It's just an entirely different scheme of regulation that's entirely missing here. Can you address election markets, election outcome markets? Do we need to address it? Should we address it? It was addressed as noted in the cease and desist letter for one of the plaintiffs here. I'm not sure that you need to address it because the burden is on them to show a likelihood of success, and their argument is that nothing on their side is going to change. It's a practical matter. For example, for Kelsey, the biggest player here, 90% of the contracts and 95% of the revenues are sports betting, but just to address why states don't allow gambling on elections and how that fits in with the CEA. First of all, there's a long history of states not allowing gambling on elections. There's no state that allows them, and I think there are strong state interests behind that in terms of potential anti-democratic, and it would be a huge change in the law to say that the states could no longer prohibit gambling on elections, and I don't think the CEA's swaps definition encompasses gambling on elections. No, that's not what they held. They were not asking the question of whether election bets are swaps. They were talking about an application of the special rule, which doesn't define if things are swaps or not. The question was, could the CFTC take down the election contracts, not are the election contracts swaps, and I would just suggest that looking at the textual indicators that we were talking about before, the associated with financial consequences and the definition of... On that point, aren't election contracts more like traditional swap contracts? You're hedging risks, so if you are, say, in 2024 November, if you're a company that invests a lot in green technology, you may hedge your risk and say, if President Trump wins, I may be adversely affected, and conversely, if your company invests in gas and oil, you may hedge risks and say, if Vice President Harris wins, I may hedge my risk. It seems it's more tied to your traditional swap contract with hedging risks. I don't think that's right, because it's not hedging risks or managing risks in some general sense. It's in the sense of the swaps definition, which is there's an event that's going to occur or not that's associated with financial, economic, or commercial consequences, and the traditional swaps are things like it's going to happen or it's not going to happen, and someone's going to lose money. So, you know, corn futures, interest rates are going to go up and down, whether there's a hurricane on a certain date. Can't you have swaps based on weather? Because on the theory that you have certain weather, it'll affect crops, affect... And you could hedge risks that way, so I don't see why the outcome of an election is that much more different than hedging risks based on weather. Well, the difference is that the weather swaps are specifically listed in the definition of swaps, so you don't rely on the definition they're using about events associated with consequences under Section 2, because Section 3 specifically addresses weather-based event swaps, and I think if you look at the history of kind of corn futures, et cetera, you know, weather-based swaps were part of that history since the beginning, because whether there was a drought had a direct financial effect in the relevant sense. And so I just don't think you can accept a definition that's kind of any hedging risk-type definition. Let's be faithful to the text of Section 2, which says an event that's associated with these consequences, where the associated means you've got a financial instrument with an underlying commodity that's going to go up or down in value. And there's just not some underlying commodity like whether someone scores a touchdown in the fourth quarter of a Bears game. Like, that's not a commodity where you can judge the value. For elections, they do. I mean, everyone knew if oil and gas industry stocks have increased if President Trump won, or if green industries would decline if President Trump won, and vice versa for Vice President Harris. So there are very direct economic consequences flowing from an election outcome. Maybe not all industries, but certain industries definitely the case. But we're not saying there are no consequences, but there's a difference between events that have inherent, that are inherently financial events that have inherent financial consequences as opposed to downstream consequences. And the downstream consequences of elections may be more significant than betting on a Little League game, which would also come within their definition of swaps, but they are downstream economic consequences as opposed to the inherent financial consequences that come from financial instruments based on an underlying commodity. And if you're not sure about that, I think an interpretive principle that would apply is that Congress legislates against the backdrop of existing law, which is the state's long regulating gambling, which here includes not allowing betting on elections because it's anti-democratic, and you would want to see a clear indication in the statutory text if you thought that Congress was going to take away that power from the states. Let me just say this. Do you believe elections are covered by 40.11 A1? I guess you would point to an activity that is unlawful under any state or federal law. That would be an easy way to do it. We also think that it is gaming because gaming means gambling. I think the thing that Kelsey urged in the other court was gaming only involves playing a game, which doesn't help them with respect to sports bets, but yes, it is conduct that is unlawful under state law, and so I think that would be an easy way to resolve it. I guess one thing I'd like to say is I understand that the court may think that there are difficult questions here or ambiguities, but I think there's an easy way to resolve that, which is to stick to the statutory text and whether these are swaps that are even within the CEA's jurisdiction in the first place, and if you're not entirely sure just from the definition they rely on, Part 2, every other interpretive principle is saying choose our, choose Judge Gordon's more limited definition that makes sense in context, that doesn't take away the state's historic police power, that doesn't have this huge shift that would raise major questions and implied repeal consequences as opposed to their view. Every indication says you shouldn't take away the historic power of the states here. Okay. Thank you. Thank you for your argument. We'll give each of the three appellants two minutes for rebuttal. I told you I wanted you all to do one, but I'm being generous. We appreciate it. Let me focus on one point, which is, I want to talk about hedging. When we talk about the difference between sports bets and sports events contracts, it's not just that the odds are set differently, it's also that they are and can be used differently, and that also goes to the potential economic consequences in the statutory definition. So, let me sportsbooks are a major business, legalized in many states, billions of dollars. If a sportsbook has an influx of bets on one side of a game, the only way that that sportsbook can hedge that risk is through the market for sports event contracts. That is no different from how a business might use swaps in order to hedge about the consequences of weather. It's the same thing. You can't do that at Caesars. A sportsbook can't do that through another sportsbook. Imagine that you have, to use Judge Lee's example, a business in Dallas that offers a huge giveaway, lots of merchandise, if the Cowboys win, that drives foot traffic to the business. But what if the Cowboys actually do win, and that's suddenly going to cost that business lots of money? That business can hedge the risk using sports event contracts. This is different from what goes on when you go into Caesars in order to play a game. You can buy an insurance contract. That's how they normally do it, is they buy an insurance contract. Your argument is that's basically what we're talking about. It may be that Woods of London would write that contract, but yes, that is what we're talking about, and that is no different from how you use a swap in order to hedge the risk from the consequences of weather, which, to Counsel's point, that doesn't have inherent financial consequences either, but it's the hedging function that creates the financial consequences, and that satisfies the statutory definition of a swap. Thank you so much. Thank you. We'll hear next from Kalshi. Thank you, Your Honor. Just a few quick points. I think that Your Honor began with me with the text, and I want to return to the text, because I think that if you look at the plain text of the CEA, as the Third Circuit did, it is very difficult to come to the conclusion that Kalshi's contracts are not swaps, and I think it's really important to look at what the state said in their colloquy with Your Honor. They started talking about inherent consequences, and consequences that are direct and not downstream, and things that have been historically known as swaps in the past, and that's somehow a limitation on what can be a swap in the future. And the problem with all of those arguments is that none of them are in the text, and every textual indication is that Congress wanted the definition of swap to be broad because of the context in which Congress was legislating, and it refers to potential economic consequences, not inherent consequences. It doesn't distinguish downstream consequences from upstream consequences, and so there's a real difficulty there just with the plain text. The other thing I'd note is they refer to other what they call express preemption provisions, and they sort of refer to the fact that historically these haven't been understood to be swaps, and therefore that should be a constraint. Congress also defines swap to be anything that in the future becomes known as a swap, so that is yet still further evidence that Congress wanted this term to apply broadly, not to be constrained, and now their argument with respect to that is, well, that would sweep too broadly, and I think that's what Judge Gordon believed below, and that's what we think is wrong, right, that it doesn't sweep too broadly, and Judge Lee, to your point with my colleague, you're absolutely right that there is a way that there is a statute is best read, the plain text of the statute is best read in light of the Savings Clause of 2E, in light of Section 16, which my colleague referred to, to draw a line, and of course Congress gave the CFTC exclusive jurisdiction over on DCM trading, and that does not mean that everything is going to get swept into the CFTC's jurisdiction and the like, and the last thing I'd note about that, Your Honor, is just my colleague referred to other federal statutes, and there's a claim about implied repeal here, I think it's really important to look at the federal statute that is most at issue in this case, which is a statute called the Unlawful Internet Gambling Act, which is where Congress deals with this question, that is, the question of gambling over the Internet, and you're sending it from one state to another, and how do we think about that? And what, and Congress adopted basically the rule that they are urging the Court to adopt, except Congress created a carve-out for, this is the text, that a wager excludes any transaction conducted on or subject to the rules of a registered entity under the Commodity Exchange Act. So that reflects a clear understanding that this is subject to the CFTC's exclusive jurisdiction, not the state's. Thank you. Thank you for your argument. And we'll hear finally from Robinette. Thank you, Your Honor. I have just one point that I'd like to emphasize in rebuttal, and that is sports bets and sports wagers of the type that somebody can enter into at a casino with a sports book, those are not swaps. The whole parade of horribles that somehow our interpretation of the word swap will sweep those in has no basis. And the reason for that fundamentally is the Commodity Exchange Act, as its name indicates, is about instruments traded on exchanges. And that's why this on DCM, off DCM principle is so important. The problem with that, though, is if you're going to go sell stocks outside of the stock market, you've got a problem. And it's not just because you can't just get out of that by saying, well, I was doing it without it being on the market. That's right, Your Honor. And that's the meaning of Section 2E. But I would point to a variety of other statutes. First, as counsel indicated, is the unlawful Internet Gambling Enforcement Act. That specifically carves out from the term bet or wager. The statute-defined term bet or wager does not include derivatives on a DCM. And so that's Congress indicating that it does not consider swaps like the ones we have here to be bets or wagers. I would also say Congress has given the CFTC has expressly given them authority to further define the term swap. That's in 15 U.S.C. Section 8302 D.1. So this is not a Loper-Bright issue. This is where there's express delegation. And there's a 2012 rulemaking where the CFTC talked about one of the hallmarks of a swap is that it's traded on organized markets. Nevada sports bets can't be traded. It is unlawful to assign them or trade them, and that is just a fundamental difference between Nevada sports bets and on DCM swaps. Thank you very much. Thank you to all counsel. We will issue an opinion as quickly as we can. I'm sure we're not the only opinion you're waiting for, and we're not the only judges that'll weigh in on this, and we appreciate the arguments that have been made to help us understand the issue. So with that, the case is now submitted.
judges: NELSON, BADE, LEE